1
2
3
4
5
6          UNITED STATES DISTRICT COURT
7               DISTRICT OF NEVADA
8                      * * *
9    UNITED STATES OF AMERICA,                Case No. 3:19-cr-00026-LRH-WGC
10                        Plaintiff,           ORDER
11         v.
12   MYRON MOTLEY,
     JOSEPH JEANNETTE, *et al.*,
13                        Defendants.
14
15
16   UNITED STATES OF AMERICA,                 Case No. 3:19-cr-00027-LRH-WGC
17                        Plaintiff,           ORDER
18         v.
19   MYRON MOTLEY, *et al.*,
20                        Defendants.
21

22         Defendant Myron Motley has filed a motion to suppress evidence obtained via two search

23   warrants dated September 6 and December 7, 2018. (ECF No. 113). Motley also contests the

24   validity of a Title III wiretap warrant issued by this Court on March 22, 2019. The government

25   responded (ECF No. 124), and Motley timely replied (ECF No. 127) and then subsequently filed

26   a "supplement" to his reply (ECF No. 129). One of Motley's co-defendants, Joseph Jeannette, filed

27

28

1

a motion to join in his motion to suppress. (ECF No. 114). For the reasons stated below, the Court denies Jeannette's motion for joinder and Motley's motion to suppress.[1]

### I. Factual Background and Procedural History

The following facts are adduced from the various pleadings and exhibits in the record. Motley currently faces charges in two separate cases. In Case No. 3:19-cr-00026-LRH-WGC, Motley and six other codefendants, are, to various degrees, indicted on thirteen charges related to a scheme to distribute oxycodone and hydrocodone (Motley is the only defendant indicted for conspiracy to distribute methamphetamine). (ECF No. 1). In Case No. 3:19-cr-00027-LRH-WGC, Motley is indicted alongside Randy Raihall (who is not a defendant in the other case) with distribution of hydrocodone. In his motion to suppress, Motley primarily challenges the issuance of two search warrants, the first of which was issued by a Nevada state court on September 6, 2018, and the second issued by this Court on December 7, 2018.

### A. September 6, 2018 Search Warrant

In the application for that warrant, Detective Chris Johnson of the Reno Police Department ("RPD") stated that on July 27, 2018, he was contacted by a confidential informant ("CI," later referred to in the Title III wiretap application as "CS-1") with information that Motley was selling "illegal prescription narcotics" in the Reno/Sparks area. (ECF No. 113-1 at 3). Detective Johnson stated that the CI "has been proven reliable during the course of a controlled drug purchase." (*Id.*) The CI told Detective Johnson that Motley routinely travels from California to Reno, Nevada, to meet with a physician who worked at Renown Health; the physician would then write Motley prescriptions for oxycodone. (*Id.*) Additionally, the physician would give Motley a "stack of prescriptions in other people's names" for Motley to sell to them. (*Id.*) One of these individuals was the CI's spouse, who had purportedly received a prescription from the physician despite having never met him. (*Id.*) The CI went on to explain that Motley would fill most of his prescriptions at the Walgreens pharmacy on South Virginia Street in Reno. (*Id.*) Another detective with the RPD, Detective Leedy, obtained Motley's information from Nevada's Prescription

---

[1] Motley filed an identical motion to suppress in a parallel case (Case No. 3:19-cr-00027). (ECF No. 47). Accordingly, this order will also be filed in that case, but the document numbers referred to herein will be from Case No. 3:19-cr-00026.

Monitoring Program database ("PMP database"), which is a "database of information regarding the controlled substance prescriptions" dispensed to individuals in Nevada.[2] (*Id.*) Motley's PMP report indicated that he had routinely received oxycodone and tramadol from a "particular physician" (later revealed to be defendant Eric Math) averaging 279 morphine milligram equivalent ("MME") per day. (*Id.* at 4). Detective Johnson stated that according to Centers of Disease Control and Prevention ("CDC") guidelines, increasing the dosage of opioids to over 90 MME per day can increase the risk of overdose. (*Id.*) The "above prescription pattern," he continued, "can be an indicator for opioid abuse or diversion." (*Id.*)

Detective Johnson then related his attempts to track Motley. On August 14, 2018, the CI told Johnson that Motley was staying at the Grand Sierra Resort ("GSR") hotel and casino in Reno. (ECF No. 113-1 at 4). Motley's PMP report indicated that he had filled his opioid prescriptions at his usual Walgreens four days earlier. (*Id.*) A vehicle records check revealed that Motley had a dark gray 2017 Nissan Rogue registered in his name; officers attempted to locate the automobile in the GSR parking lot but were unsuccessful. (*Id.* at 5). The following day, officers observed Motley in the GSR on the casino floor, but they were unable to track him after he disappeared into the residential portion of the casino. (*Id.*) Based on Detective Johnson's narrative and Motley's lengthy criminal history of drug trafficking, the state court granted the search warrant and allowed police to place a tracking device on Motley's Nissan.

**B. December 7, 2018 Search Warrant**

The second search warrant, issued on December 7, 2018, by Magistrate Judge Carla Baldwin, also sought to place a tracking device on Motley's Nissan. (ECF No. 113-2 at 4). In the warrant application, FBI Special Agent Erik Anderson summarized the relevant details of Detective Johnson's warrant and provided updates on the investigation since the issuance of the September 6 warrant. Agent Anderson stated that Motley had been spotted with several individuals, including Jeannette, at the Walgreens pharmacy on South Virginia Street. (*Id.* at 11).

---

[2]   *Prescription Monitoring Program (PMP)*, NEVADA STATE BOARD OF PHARMACY, http://bop.nv.gov/links/PMP/ (last visited March 3, 2020). The Board of Pharmacy's website explains that the database is "an online tool that allows prescribers and dispensers access to a patient's controlled substance prescription medication history." It also "aids…law enforcement agencies in the detection and prevention of fraud, drug abuse, and the criminal diversion of controlled substances."

1   A check of Jeannette's PMP report revealed that Math had been prescribing him an average of 372

2   MME of opioids per day, well-above the CDC's recommended 90 MME limit. (*Id*.) Motley was

3   observed traveling to various Reno-area casinos with Jeannette, where the two would sometimes

4   meet with Math. (*Id*. at 12). Motley was also observed having brief meetings with individuals,

5   including defendant Michael Slater (to whom Math had not prescribed any opioids), shortly after

6   filling prescriptions at the Walgreens. (*Id*. at 13–14). In Agent Anderson's opinion, this was

7   indicative of Motley illegally supplying opioids to these individuals. (*Id*.) Based on the information

8   contained within Agent Anderson's affidavit, Judge Baldwin granted the search warrant.

9   ### C. March 22, 2019 Title III Wiretap Application

10  On March 22, 2019, Agent Anderson and the U.S. Attorney's Office for the District of

11  Nevada applied to Chief Judge Miranda M. Du for a Title III wiretap of Motley's cell phone. (ECF

12  No. 113-3 at 2–3). In Agent Anderson's affidavit accompanying the application, he alleged that

13  Motley, Math, Jeannette, Slater, defendant Michael Kwoka, and defendant Alesia Sampson were

14  involved in a drug trafficking organization ("DTO") with Motley occupying a leadership position.

15  (*Id*. at 35). Agent Anderson stated that three confidential sources were used in the investigation –

16  CS-1, CS-2, and CS-3. (*Id*. at 39). CS-1, who is the same individual Detective Johnson used in his

17  original investigation, alleged that Motley "managed at least five individuals" who were being

18  supplied with opioids by Math. (*Id*. at 41). Motley would obtain an opioid prescription from Math

19  written for one of his associates and then sell that associate the corresponding prescription. (*Id*.)

20  The associate would fill the prescription and give Motley a cut of the pills. (*Id*.) Motley used his

21  cell phone to coordinate these transactions. (*Id*.) CS-2 stated that Motley sells the majority of his

22  prescription narcotics to Slater, who was the person who introduced CS-2 to Motley. (*Id*. at 42,

23  59). Agent Anderson noted that "[m]uch of the information" provided by CS-2 had been

24  corroborated through other investigative means, such as physical surveillance, CS-3, recorded

25  meetings, and text messages. (*Id*. at 42, 62–63, 69). As for CS-3, Agent Anderson stated that CS-

26  3 participated in recorded conversations with Slater and also provided text messages from Slater,

27  both of which implicated Slater as a DTO member. (*Id*. at 43).

28  ///

In his affidavit, Agent Anderson provided a detailed background of the investigation, incorporating much of the information used in the September 6 and December 7 search warrant applications along with new information obtained in part as a result of those warrants. (ECF No. 113-3 at 47–81). The new information included controlled buys conducted by law enforcement, whereby CS-2 and CS-3 purchased opioids from Motley and Slater respectively while wearing audio and video recording equipment. (*Id*. at 64–67, 70–71). Cell phone records from defendants indicate that from February 14 through March 13, 2019, Motley used his phone to contact Math 7 times, Slater 26 times, Jeannette 90 times, Kwoka 147 times, and Sampson 11 times. (*Id*. at 74–75, 78–80).

Agent Anderson also explained why certain investigative techniques were not used, considered, or otherwise would be ineffective to seek the information the wiretap would provide. Regarding additional confidential sources, Agent Anderson stated that while the confidential sources investigators had used up until that point provided them with useful information, none of the three were particularly close to either Motley or Math, the two heads of the DTO. (ECF No. 113-3 at 87–89). Agent Anderson believed that given the confidential sources' relationships (or lack thereof in the case of CS-1) with Motley and Slater were that of buy-seller, it would have been suspicious for any of them to try to insert themselves into their operation. (*Id*.) Investigators also considered using Slater as a collaborator, but decided against it because "it [was] unlikely that Motley would share information with Slater regarding how Motley obtain[ed] the prescription opioids since to do so would eliminate Motley's need to be a seller of [opioids] to Slater." (*Id*. at 90). Agent Anderson similarly believed that trying to introduce an undercover investigator into Motley's organization would be ineffective because "it is not feasible in the Reno area to introduce [an undercover officer] into a DTO such as this at a level high enough to accomplish the goals of the investigation." (*Id*. at 93). In particular, he did not believe that any undercover officer would be able to infiltrate Motley's DTO any higher than CS-2 had. (*Id*. at 94).

Chief Judge Du granted the application for the Title III wiretap. Motley and his codefendants were indicted with the charges outlined above on May 23, 2019. (ECF No. 1).

1 Following several continuances, Motley filed the instant motion to suppress on January 24, 2020

2 (ECF No. 113), to which Jeannette filed a motion to join (ECF No. 114).

3 ## II. Discussion

4 ### A. Jeannette's Motion for Joinder

5 Before the Court reaches the merits of Motley's motion to suppress, the Court will first

6 discuss Jeannette's motion for joinder. In his motion, Jeannette argues that he should be allowed

7 to join Motley's motion because he "is an indicted member of the same alleged conspiracy" and

8 "the issues raised in the motion apply with equal force" to him. (ECF No. 114 at 1). It is well-

9 established, however, that a third party does not have "standing" to challenge the search and

10 seizure of another's property because Fourth Amendment rights are personal in nature and cannot

11 be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). This case involves two

12 tracking devices placed on Motley's vehicle and a wiretap targeting Motley's personal cell phone.

13 Jeannette has not alleged that his vehicle or any of his personal property was the target of

14 government intrusion. Accordingly, Jeannette cannot challenge evidence obtained as a direct result

15 of the September 6 and December 7, 2018 search warrants. *See, e.g., U.S. v. Hernandez*, 647 F.3d

16 216, 219 (5th Cir. 2011) (defendant could not challenge the placing of a GPS device on his

17 brother's truck because he did not own the truck or regularly drive it); *U.S. v. Rivera*, No. 11-CR-

18 0196-J, 2012 WL 12919987, at *3 (D. Wyo. Mar. 22, 2012) (stating that certain defendants lacked

19 the capacity to challenge the government's use of GPS devices because they neither owned or

20 possessed the target vehicles).

21 On the other hand, an illegal wiretap may be challenged by any person "aggrieved" by the

22 surveillance. *U.S. v. Taketa*, 923 F.2d 665, 676 (9th Cir. 1991) (citing 18 U.S.C. § 2518(10)(a)).

23 The Ninth Circuit has interpreted the phrase "aggrieved person" to mean anyone who was a

24 participant in an intercepted conversation or against whom the interception was directed. *U.S. v.

25 Oliva*, 705 F.3d 390, 395 (9th Cir. 2012); *U.S. v. King*, 478 F.2d 494, 506 (9th Cir. 1973). In Agent

26 Anderson's affidavit, Jeannette is specifically listed as a suspected member of the Motley DTO

27 who had significant communication with Motley himself. (ECF No. 113-3 at 78–79). But in his

28 motion for joinder, Jeannette does not identify any of Motley's intercepted communications in

which he (Jeannette) was a participant. Jeannette does not have the capacity to challenge any intercepted communication of which he was not part; given that Jeannette has not identified any communications to which he was a party, the Court will deny his motion for joinder in full. *See, e.g., U.S. v. Azano Matsura*, 129 F.Supp.3d 975, 979 (S.D. Cal. 2015) (rejecting defendants' argument that because they were parties to at least one intercepted communication, they may challenge the contents of all intercepted communications).[3]

### B. September 6 and December 7, 2018 Search Warrants

The central argument in Motley's motion to suppress is that law enforcement should have obtained a warrant before accessing his information in Nevada's PMP database because he had an objectively reasonable expectation of privacy in his information stored in the database. (ECF No. 113 at 8). The threshold question in any Fourth Amendment challenge to a search is whether the defendant had a reasonable expectation of privacy in the property or place searched. *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). This expectation is established where the defendant can show both a subjectively and objectively reasonable expectation of privacy. *U.S. v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). This case presents a less straightforward question than most Fourth Amendment cases because the place that was searched was an online database not accessible to the general public.

Like nearly every other state, Nevada operates an online database that requires pharmacies and doctors to track prescriptions filled for schedule II, III, IV, and V controlled substances. NEV. REV. STAT. §453.162 (2020). The database is designed to provide information regarding the "inappropriate use by a patient of controlled substances to pharmacies, practitioners…appropriate state and local governmental agents…[and] law enforcement agencies…to prevent the improper or illegal use of those controlled substances. *Id*. §1(a)(1). The statute and applicable regulations require pharmacies that dispense one of the covered controlled substances to log certain information, such as the name, address, and phone number of the individual prescribed the

---

[3] Ordinarily, the Court would deny Jeannette's motion without prejudice and afford him an opportunity to identify the specific communications in which he alleges he participated. But because the Court finds that the March 22, 2019 wiretap application was lawfully granted, any amendment Jeannette could make would be futile.

controlled substance. *Id.* §453.163; NEV. ADMIN. CODE §639.926 (2018). The pharmacy is also required to provide information regarding the substance prescribed, refill amount, and quantity dispensed. NEV. ADMIN. CODE §639.926 (2018). Only authorized individuals, such as practitioners and pharmacists, are allowed access to the database, and only for limited purposes. NEV. REV. STAT. §453.164 (2020). Law enforcement officers are allowed to access the database, but they may do so only to "investigate a crime related to prescription drugs" or log information related to an investigation. *Id.* §453.165. There is no requirement that law enforcement obtain a search warrant before accessing the database.

The Supreme Court addressed prescription monitoring legislation in *Whalen v. Roe*, 429 U.S. 589 (1977). There, New York passed a law requiring the names and addresses of all people prescribed certain drugs along with information about the prescription be entered into a rudimentary digital database. *Id.* at 591. The Supreme Court upheld a privacy challenge to the law, noting that "individual States have broad latitude in experimenting with possible solutions to problems of vital local concern." *Id.* at 597. New York had a "vital interest" in controlling the distribution of dangerous drugs in its territory, and it could do so via the monitoring program. *Id.* The challengers had argued that the statute invaded a constitutionally protected "zone of privacy," but the Supreme Court rejected this argument. It noted that the prescription information that had to be provided was shielded from public view with only a select group of individuals capable of accessing it. *Id.* at 601–02. And for those people, the Supreme Court stated that disclosure to them was not "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care" and disclosures to people like doctors, hospital personnel, and public health agencies are "often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient." *Id.* at 602. "Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Id.* Notably, the Supreme Court rejected the challengers' argument that a right of privacy emanated from the Fourth Amendment. *Id.* at 604, n. 32.

///

8

Little caselaw is available concerning the interaction between the Fourth Amendment and PMP databases. In one case, the Drug Enforcement Administration (DEA) filed suit against the Utah Department of Commerce when it refused to honor an administrative subpoena that sought controlled substance prescription records of a criminal suspect. *U.S. Dep't of Justice v. Utah Dep't of Commerce*, No. 2:16-cv-611-DN-DBP, 2017 WL 3189868 (D. Utah July 27, 2017). Like Nevada, Utah had a prescription drug database that catalogued much of the same information as the PMP database at issue here. *Id.* at *3. Utah refused to honor the DEA subpoena because it did not first obtain a warrant to search the database, but the District of Utah ultimately ruled that the DEA was not bound by a requirement to obtain a search warrant. That court noted that under the Controlled Substances Act (CSA), the DEA was authorized to issue administrative subpoenas to investigate drug-related crimes that, under the applicable law, only required "reasonable relevance," not probable cause. *Id.* at *2, 7. In doing so, the court held that individuals did not have a reasonable expectation of privacy in Utah's prescription database:

> Controlled substance use is further regulated by the State of Utah under the Database Act, which has a parallel regulatory purpose. A patient in Utah decides to trust a prescribing physician with health information to facilitate a diagnosis. In so doing, a patient takes the risk—in this circumstance, a certainty—that his or her information will be conveyed to the government as required by the Database Act. The Supreme Court "has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." Surely there is even less expectation of privacy in records held by a governmental entity, when considering a request by another governmental entity.

*Id.* at *8 (internal citations omitted). The court concluded by noting that while the state of Utah had the authority to require its own law enforcement officials to obtain a warrant before accessing the database, the Fourth Amendment did not require one. *Id.*

The District of Oregon faced a similar question in *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*, 998 F.Supp.2d 957 (D. Or. 2014). There, the DEA had served the same type of administrative subpoena on Oregon's prescription monitoring database, which the state similarly rejected. *Id.* at 960. Under Oregon law, health officials could only disseminate information contained in the database to law enforcement if they obtained a valid court order based on probable cause. *Id.* Similar to the Utah case, Oregon sought a declaration that

it was not required to comply with the administrative subpoena. The district court "easily" found that individuals with information in the database had an objectively reasonable expectation of privacy, but this determination was later overturned on appeal because the court failed to conduct the proper standing analysis for the patient challengers. *Id*. at 966; *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin*., 860 F.3d 1228 (9th Cir. 2017). Outside of the standing issue, the Ninth Circuit found, like the District of Utah, that the CSA's administrative subpoena function preempted Oregon's requirement that law enforcement obtain a probable cause-based court order. *Oregon Prescription Drug Monitoring Program*, 860 F.3d at 1237.

After reviewing the relevant case law, the Court finds that Motley does not have a reasonable expectation of privacy in the information contained in Nevada's PMP database. The reasonable expectation of privacy inquiry has two components—a defendant must have a subjective expectation of privacy in the place searched, and society must be willing to recognize that expectation as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). It is unclear here whether Motley had a subjective expectation of privacy in his PMP records. There is no evidence to indicate that Motley knew of the database's existence during the time he filled the opioid prescriptions prescribed by Math, and he does not make any assertion of his knowledge in briefing.

But even assuming that Motley did have a subjective expectation of privacy in his database information, that expectation was not reasonable. First, the PMP database and the information contained within are maintained by a governmental entity (the Nevada State Board of Pharmacy) entirely outside of Motley's control. The Supreme Court's decision in *Whalen* established that States have a compelling interest in ensuring that prescription medication is not mishandled or abused within their borders, and a digital monitoring database is one permissible way of achieving that objective. *Whalen v. Roe*, 429 U.S. 589, 597 (1977). The Nevada State Board of Pharmacy grants law enforcement access to a suspect's information when they suspect illegal activity involving prescription drugs. NEV. REV. STAT. §453.165 (2020). By the time the disclosure occurred in July 2018, Motley had already voluntarily released his information to multiple third parties—the prescribing physician (Math), the pharmacy technicians who filled his order, and the

10

governmental entity that operates the PMP database. The Supreme Court has held that the "Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [the third party] to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *U.S. v. Miller*, 425 U.S. 435, 443 (1976). This concept is referred to as the third-party doctrine.

In his reply, Motley cites to *Carpenter v. U.S.*, 138 S. Ct. 2206 (2018), for the first time, arguing that the cell site data at issue in that case is the same as the PMP records in this case. But *Carpenter* is readily distinguishable. At issue in *Carpenter* was a standard practice of law enforcement at the time. They were obtaining cell site data from private entities, namely telecommunication companies like T-Mobile and Verizon, without search warrants. *Id*. at 2211–12. This data is generated when a cell phone pings off of a cell tower, and when gathered together, the data establishes a suspect's location at any given time. *Id*. The Supreme Court held that warrantless access to cell site data was a violation of the Fourth Amendment; given the "unique nature of cell phone location records" that show a suspect's movements just as effectively as a GPS tracking device, it made little sense to treat the two investigation techniques differently. *Id*. at 2216–17. Despite holding that the third-party doctrine did not apply to cell cite data, the Supreme Court did not overturn *U.S. v. Miller*, the case that established the doctrine, instead noting that "a warrant is required in the *rare case* where the suspect has a legitimate privacy interest in records held by a third party." *Id*. at 2222 (emphasis added).

The first difference between *Carpenter* and the instant case is what entity holds the data sought by the government. In *Carpenter*, the government (law enforcement) sought location data from private entities. 138 S. Ct. 2206, 2211 (2018). But here, law enforcement sought prescription information from another governmental entity, the Nevada State Board of Pharmacy. As the District of Utah noted, there is a lesser expectation of privacy when a governmental entity requests records from another governmental entity as opposed to when the government requests information from a private entity. *U.S. Dep't of Justice v. Utah Dep't of Commerce*, No. 2:16-cv-611-DN-DBP, 2017 WL 3189868, at *8 (D. Utah July 27, 2017). *See also U.S. v. Hamilton*, 434

F.Supp.2d 974 (D. Or. 2006) (denying motion to suppress employment and financial records obtained from state employment office by a federal officer without a warrant).

Second, individuals who receive prescription drugs do not have any reasonable expectation of privacy in the highly regulated prescription drug industry. In *U.S. v. Miller*, the Supreme Court held that a suspect did not have a reasonable expectation of privacy in records kept by his bank. 425 U.S. 435 (1976). There, in the course of an ATF investigation, the federal government sought and received warrantless access to a suspect's banking records, which consisted of checks, deposit slips, and account information. *Id*. at 437–38. The court ruled that the defendant did not have any Fourth Amendment interest in the bank records because not only were the records the property of the bank, the bank kept them pursuant to the Bank Secrecy Act. *Id*. at 440–41. Similarly, pharmacies are required to keep certain records pursuant to the Controlled Substances Act, and other courts have noted that the pharmaceutical industry is highly regulated by the federal government. *U.S. v. Acklen*, 690 F.2d 70, 75 (6th Cir. 1982) (the "pharmaceutical industry, like the mining, firearms, and liquor industries, is a pervasively regulated industry and that consequently pharmacists and distributors subject to the Controlled Substances Act have a reduced expectation of privacy in the records kept in compliance with the Act."). *See also Big Ridge, Inc. v. Federal Mine Safety and Health Review Com'n*., 715 F.3d 631 (7th Cir. 2013) (holding that miners did not have a Fourth Amendment expectation of privacy in health and personnel records held by their employers when, pursuant to the Mine Safety Act, a federal agency requested the records to ensure compliance). Given that the pharmaceutical industry is required by federal law to keep the types of records sought by Detective Leedy in this case, Motley did not have a reasonable expectation of privacy in the PMP database.[4]

Motley attempts to conflate information related to the lawful distribution of controlled substances with "medical records," citing to *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), but this comparison is misguided. (ECF No. 113 at 15). One of the legal challenges in

---

[4] Moreover, it is uncontested that a federal law enforcement officer could have obtained Motley's records in the PMP database through an administrative subpoena, which does not require probable cause. *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin*., 860 F.3d 1228, 1236–37 (9th Cir. 2017). Absent state law to the contrary, it would be illogical to allow a federal agent to obtain the records without a warrant but require a state agent to obtain a warrant before he could access the records.

that case was to an Arizona law that allowed the state's Department of Health Services access to medical records kept at abortion clinics. *Id*. at 537. The Ninth Circuit held that this provision was unconstitutional because the abortion industry was not a "closely regulated" industry like, for instance, the liquor or veterinary drug industries. *Id*. at 550. Accordingly, the records held at Arizona abortion clinics were not kept pursuant to federal law, unlike the PMP records at issue here, but rather in the course of the abortion clinics' ordinary business practices. An individual's general medical records are substantially different from an individual's prescription drug records.

Motley makes passing reference to the Health Insurance Portability and Accountability Act (HIPAA), asserting that "[n]one of the HIPAA exceptions to disclosures at the request of law enforcement officials cover warrantless searches of the PMP database." (ECF No. 113 at 18). PMP databases, however, are not covered entities under HIPAA. HIPAA mandates that "covered entities" (health plans, healthcare clearinghouses, and healthcare providers) that transmit health information electronically abide by certain privacy rules. 45 C.F.R. §§160.103, 164.502. PMP databases are clearly not health plans or healthcare providers. HIPAA defines a "healthcare clearinghouse" as "a public or private entity that processes or facilitates processing of information received from another entity in nonstandard format or containing nonstandard data content into standard data elements or a standard transaction." *Id*. §160.103. A "transaction" is a "transmission of information between two parties to carry out financial or administrative activities related to health care." *Id*. The primary purpose of the Nevada PMP database is to monitor the distribution and use of controlled substances to prevent abuse or criminal activity; this is clearly not a "financial or administrative activity." PMP databases, therefore, cannot be considered healthcare clearinghouses, and are accordingly not covered under HIPAA.

Even if Motley had a reasonable expectation of privacy in the PMP database, Detective Leedy's search of it without a warrant is subject to the good faith exception. When evidence is obtained in violation of the Fourth Amendment, the exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search. *Mapp v. Ohio*, 367 U.S. 643, 649 (1961). But because the purpose of the exclusionary rule is to deter police misconduct, *U.S. v. Calandra*, 414 U.S. 338, 348 (1974), it does not apply in situations where exclusion of the evidence

obtained would not alter the misbehavior of law enforcement officers, *U.S. v. Krull*, 480 U.S. 340, 348–49 (1987). In addition to cases where, unknown to police, a search warrant is mistakenly granted, the good faith exception to the exclusionary rule applies where law enforcement rely on a statute authorizing warrantless searches later found to be unconstitutional. *Id*. at 349–50.

Detective Leedy had every reason to believe that he was authorized to access Motley's PMP records without a search warrant. The operative Nevada statute authorized him to inspect an individual's data in the PMP database in the course of an investigation into crimes involving prescription drugs. NEV. REV. STAT. §453.165 (2020). Even if the warrantless search provision of the statute is later found to be unconstitutional, at the time of his investigation, he believed he was acting lawfully. A statement the Supreme Court made in *U.S. v. Leon* explains why excluding the evidence in this case would be misguided—"excluding the evidence can in no way affect [an officer's] future conduct unless it is to make him less willing to do his duty." 468 U.S. 897, 920 (1984). *See also Davis v. U.S.*, 564 U.S. 229, 240 (2011) ("In 27 years of practice under *Leon*'s good-faith exception, [the Supreme Court has] never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct."). Motley argues that there can be no good faith exception because of the District of Oregon's decision in 2014, but not only was that case non-binding in the District of Nevada and did not address Nevada's statute, it was overturned in 2017—well before Detective Leedy accessed the PMP database in July 2018.

Motley does not challenge any other aspect of the two search warrants, such as whether they allege facts sufficient to sustain a finding of probable cause. Accordingly, the Court will deny his motion to suppress the fruits of the two search warrants.

## C. March 22, 2019 Title III Wiretap Application

Motley raises two arguments as to the validity of the March 22, 2019 wiretap application. First, he argues that there was insufficient evidence to support a probable cause finding that he and his codefendants were members of a drug trafficking organization ("DTO"). (ECF No. 113 at 21). Second, he argues that even if there was probable cause to support such a finding, the affidavit attached to the wiretap application failed to demonstrate a genuine necessity for electronic surveillance. (*Id*. at 24).

18 U.S.C. §2518 lists the requirements the government must meet to have a wiretap application granted. Relevant here, the government must demonstrate that:

(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) There is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]

(d) … there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

*Id*. at (3). "Probable cause" exists when the issuing judge determines that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reviewing courts are tasked with only looking at the four corners of a wiretap application to determine if there is a "substantial basis" for the findings of probable cause. *U.S. v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995).

Motley argues that Agent Anderson's affidavit "fails to provide any evidence of a conspiratorial connection" between the defendants to traffic drugs. (ECF No. 113 at 21). The Court disagrees. Agent Anderson's affidavit notes that a reliable confidential source provided information to investigators that Math regularly sells prescription medication to Motley. (ECF No. 113-3 at 40–43). Two other confidential sources informed investigators that Motley resells opioids to Slater. (*Id*.) The PMP database records of Motley and Jeannette confirmed that Math had been prescribing them large dosages of opioids for some time. (*Id*. at 50). Law enforcement observed Motley repeatedly meeting with Math (at casinos), Jeannette, and Slater; Motley was also seen meeting briefly with Slater at his (Slater's) residence, and he was seen traveling around with Jeannette to pharmacies to fill opioid prescriptions. (*Id*. at 54–55). Investigators further observed Math, Kwoka, and Sampson together at a casino, where Kwoka was spotted dropping "a stack of cash" next to Math in exchange for a piece of paper that was believed to be an opioid prescription. (*Id*. at 56). Further investigation revealed meetings between Motley, Kwoka, and Math. (*Id*. at 58–59). After those meetings, Motley would meet with Slater at his apartment. (*Id*.) Agent Anderson

15

1   noted that Motley would frequently travel to Slater's apartment shortly after filling an opioid

2   prescription at the Walgreens pharmacy, which lead him to believe that Motley was selling part of

3   the opioids to Slater. (*Id*. at 61).

4          Agent Anderson also discussed several controlled buys that CS-2 and CS-3 participated in

5   on behalf of law enforcement. CS-2 purchased oxycodone from Motley three times, once each on

6   January 3, January 11, and March 14, 2019. (ECF No. 113-3 at 63–68, 73). Slater was the

7   individual who initially contacted CS-2 via text to inform CS-2 that Motley had opioids available

8   for sale. (*Id*. at 63). Previously, CS-3 had participated in a controlled buy with Slater and purchased

9   opioids from him on December 18, 2018. (*Id*. at 70). Motley's phone records indicated that he had

10  frequent contact with each of his codefendants between February 14 and March 13, 2019,

11  especially with Jeannette and Kwoka, the former of whom he contacted 90 times and the latter 147

12  times. (*Id*. at 78–79).

13         Agent Anderson's affidavit establishes that: (1) the six codefendants were well-acquainted

14  with each other; (2) Motley and Jeannette were regularly obtaining large quantities of opioids from

15  Math, and (3) Motley was regularly selling opioids to Slater and other individuals, including

16  confidential sources. The Court finds that Agent Anderson's affidavit established that there was

17  probable cause to believe that Motley was engaged in a conspiracy to illegally distribute

18  prescription opioids.

19         Motley next argues that the affidavit was insufficient to establish that a wiretap was

20  necessary. (ECF No. 113 at 26). Generally, the government must overcome the statutory

21  presumption against granting a wiretap application by showing necessity. *U.S. v. Ippolito*, 774

22  F.2d 1482, 1486 (9th Cir. 1985) (citing *U.S. v. Giordano*, 416 U.S. 505, 515 (1974)). The court

23  must find that "normal investigative techniques employing a normal amount of resources have

24  failed to make the case within a reasonable period of time." *Id*. (quoting *U.S. v. Spagnuolo*,

25  549F.2d 705, 710 (9th Cir. 1977)). Although Motley repeatedly complains of "boilerplate"

26  language in Agent Anderson's affidavit (ECF No. 113 at 25), the presence of boilerplate language

27  is not determinative to the necessity issue. *U.S. v. Garcia-Villalba*, 585 F.3d 1223, 1230 (9th Cir.

28  2009). Instead, courts are tasked with looking at the accompanying affidavits as a whole. *Id*.

Motley makes two arguments as to necessity.[5] First, he argues that law enforcement failed to exhaust their confidential sources or work towards developing cooperators. (ECF No. 113 at 26). He asserts that law enforcement's failure to use CS-1's spouse as a confidential source because the spouse " 'was a drug addict' " was "perplexing" given that CS-1 and CS-3 were also known drug users. (*Id*. at 27). Without a citation to evidence, he calls into doubt whether law enforcement ever approached CS-1's spouse "to assess her willingness to cooperate." (*Id*.) Missing from Motley's edited citations to Agent Anderson's affidavit is the latter's explanation why investigators never utilized CS-1's spouse as a confidential source – "CS-1's spouse was a drug addict and therefore unwilling to cooperate with investigators *since any cooperation on his/her part would mean termination of access to prescription opioids*." (ECF No. 113-3 at 88) (emphasis added). It is logical to believe that someone addicted to prescription opioids would not want to endanger access to the opioids. Agent Anderson's explanation is certainly not, as Motley argues, "absurd." (ECF No. 113 at 27). Motley claims that CS-1's spouse would have been a "perfect cooperator," but he does not explain how the spouse would be "perfect" for achieving the aims of the investigation. (*Id*.) Agent Anderson's explanation that neither of the three confidential sources, especially CS-3, were especially close to Math or Motley is sufficient to establish that further utilization of any of them would not have been effective.

Motley also claims that Slater "was uniquely situated to infiltrate the alleged Mora-led [sic] DTO" and complains that investigators dismissed him as a possible confidant because he too was a drug user. (ECF No. 113 at 27). But Motley once again ignores Agent Anderson's explanation for why Slater would not have been an effective informant—"Although Slater is frequent[ly in] contact with Motley and is aware of what prescription opioids Motley will be selling, it is unlikely Motley would share information with Slater regarding how Motley obtains the prescription opioids since to do so would eliminate Motley's need to be a seller of prescription opioids to Slater." (ECF No. 113-3 at 90). This explanation is sufficient to show that utilizing Slater would likely not have advanced the goals of the investigation.

---

[5] Motley also makes a conclusory statement that "[c]ommencing a financial investigation is a condition precedent to a showing of necessity for a wiretap," but he cites to no supporting law. The Court declines to address arguments made without citation to controlling or persuasive authority.

Second, Motley argues that law enforcement failed to consider utilizing an undercover officer as a prospective patient to infiltrate Math's office. (ECF No. 113 at 27). He claims it is a "common practice" in investigations involving an overprescribing physician, but it was "inexplicably" not used in this case. (*Id*.) Motley's argument is belied by the evidence in this case, which shows that Math frequently conducted drug deals at Reno-area casinos rather than his office. Motley does not explain how effective introducing an undercover officer as a prospective patient would be. It is unclear to the Court how said officer would be able to infiltrate the Motley DTO simply by becoming a patient of Math. In his affidavit, Agent Anderson explained that given the relatively small scale of the Motley DTO, it would not have been feasible to introduce an undercover officer to the DTO beyond the officer completing a few low-level buys from either Slater or Motley. (ECF No. 113-3 at 93–94). The limitations of CS-2 and CS-3 provide credence to Agent Anderson's explanation.

Motley has not identified any other portions of Agent Anderson's affidavit that he claims are defective regarding the necessity of a wiretap. Upon a review of the other investigation methods considered by law enforcement, the Court is satisfied that they were given the appropriate level of thought as to their effectiveness. For example, law enforcement planned to conduct additional physical surveillance of the defendants and related individuals, but Agent Anderson noted that physical surveillance up until that point had failed to identify any other possible members of the DTO, such as an inside source at a pharmacy. (ECF No. 113-3 at 96). Agent Anderson also explained that search warrants would be ineffective because not only would their use reveal the existence of the investigation to defendants, but there was no intelligence to indicate that Math illegally stored prescription opioids at his office. The Court will accordingly deny Motley's motion to suppress the fruits of the March 22, 2019 wiretap.

///

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. Conclusion

IT IS THEREFORE ORDERED that defendant Joseph Jeannette's motion for joinder (ECF No. 114) is **DENIED**.

IT IS FURTHER ORDERED that defendant Myron Motley's motion to suppress evidence (ECF No. 113) is **DENIED**.

IT IS FURTHER ORDERED that this order be filed in Case No. 3:19-cr-00027-LRH-WGC, where it will serve to **DENY** Motley's motion to suppress evidence (ECF No. 47).

IT IS SO ORDERED.

DATED this 6th day of March 2020.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE